May it please the Court, my name is Mario Valenzuela. I am the appellant's attorney, pro bono. I'd like to reserve the Court's permission for three minutes. Certainly. Your Honor, I'm going to start with Appellee Mew first, the doctor, in this case the private party here. There was a special verdict. It was not objected to in this case. We find there that regardless of the objection, there was not a waiver in this case. The Court still had an obligation to ensure that that verdict was legal. It covered the circumstances of the case, and that wasn't the case here. The verdict relied only on the language of the x-rays. There was more than just x-rays. The verdict should include it. It should include it, the suffering. There was pain. There was excruciating pain. At the hospital, there was level 9 pain. There was, in fact, the x-rays from the radiologist when he diagnosed the femur displacement indicated that the trigger was pain. So for the Court to limit the special verdict, one, to just the x-ray was an error because it did not allow the jury to consider the pain in his that was involved in this case. Was Wheeler representative of counsel at the trial? He was towards the tail end for the trial preparation and the trial itself. But up to that point, he was pro bono. But when the judge suggested that he did, Your Honor, I submitted the verdict. And counsel agreed to the wording of the special verdict form specifically? There was no objection to it, Your Honor. Regardless of there's no objection to the verdict form, Your Honor, counsel for the appellee Wheeler submitted a case, Peralta, and it's at 1182, that indicates the judge still has an obligation to ensure that the verdict that the judge drafts covers the circumstances and the law applicable to the case. That was not the case here because it did not cover the pain and the suffering that triggered the x-rays. Your client got in a fight with another inmate, correct? He did not get in an actual physical fight. He was punched, sucker punched. He did try to go after him. He did try to grab him, but he never actually made contact with him. And the guards told him to stop? The guards did tell him to. And he refused? He did not hear the guards until he was hit with a baton. In his testimony, he indicates that they took him to the floor when, to their view, he did not heed the admonition. That's correct, Your Honor. I think he went to the floor. And that's where the femur injury occurred? That is correct. That's our contention. And he was, once the parties were separated, the combatants, your client, was given medical care? It was about three hours later. They had an interview at the infirmary, but I don't know how many hours later... When was the x-ray done? It was done sometime over three hours after. I don't know how... Leading up to the x-ray or during it, did he request pain medication? He did. Right from the beginning, he claimed excruciating pain from the incident. Did they give many? It doesn't look like they... They may... I'm not sure, Your Honor, at this point. I can't recall that they did. I know they gave him pain at the hospital, when he got to the hospital. That's where the x-ray was done? Yes. Okay. Go ahead. So he got medical attention. You're just saying it's the wrong kind, or... He got medical attention, but when he was referred to the hospital, he wasn't referred to the hospital for the injury on the leg or the femur. He was referred to the hospital for the broken jaw that he sustained. And there was no record that any information related to the leg injury or the knee, it was right above the knee, was relayed to the hospital. They did x-ray his knee? Yes, after he complained about the pain at the hospital, at the emergency room. At that point, they x-rayed his knee. So he ended up suffering for over three hours before there was a proper diagnosis and the x-ray took place when they discovered the displaced knee. I also want to point out that the respondent, I mean, the appellee, Miu, was not in the case. He submitted a 28-J letter supplementing this case with Claiborne, the case of Claiborne that the circuit recently addressed. In this case, I think Claiborne may be applicable for the standard review. I believe it could be said that the court made an incorrect special verdict because it did not follow the law at the time. That is similar to Claiborne. There was a mistake. It was a serious mistake. It affected his rights, and it affected his rights substantially in the administration of justice. In Claiborne, the court cited that in — Claiborne had to deal with shackles in a criminal case in the courtroom, and it said it wasn't — that that wasn't a mandated reversal. And they actually referenced it's similar to having a bad jury instruction, like putting your thumbs in the scale. That's exactly what happened here. There was a bad jury instruction. And that — So let's assume that you can get past the waiver issue on the special verdict form, because that seems to be the focus of your argument. What's your best argument, that the verdict form somehow misled the jury? I think the verdict form limited the — it took away from the jury their ability to measure the pain and the circumstance leading up through the X-ray point. It didn't cover those in the time period that he complained about. It only — it minimizes the extent of his injury, minimizes the extent of his pain and suffering, because it only says that the X-rays trigger the impression of the, you know, the — But where does it say that? It says, did he face a serious medical need arising from the condition described in the X-ray? Well, that's the whole thing. The condition is not truly described there. The condition includes the pain that he endured. And that's not described there. It only talks about the X-ray. You understand your client's burden on appeal is to establish not just medical negligence, but deliberate indifference. You understand that? I understand that, Your Honor. What's your best proof of deliberate indifference? The best proof is that between the time he sustained the injury to the time he went to the hospital, and even at the hospital, there was no communication as to his injury and his leg. It was just ignored altogether. And what's your proof that prison officials or medical personnel at the hospital knew of the leg injury and deliberately ignored it? Well, at the prison, he expressed his pain related to his knee. At the hospital, he was in particular his knee, and he rated that pain as a nine. It was only after those incidents took place. And he was given medication? He was given an X-ray at that point, yeah. And medication? And medication for the pain. Yes. Okay. Where's the deliberate indifference? Deliberate indifference is the delay in having that take place. Where is this prison? This prison's in Corcoran, and his hospital was in Biggersore, California. How far away is it? Drive time, a good hour, hour and a half maybe. And how long after the scuffle was he put in an ambulance? That is unclear for me from the record, Your Honor. That's not in the record? It may be in the record, but it wasn't clear to me. Is there any evidence that prison officials deliberately delayed calling for an ambulance? Well, I believe there was, because rather than give him immediate medical need, attention, they conducted an interview first of the incident before they transported him out. Of course, that happens all the time with prisoners, doesn't it? You've got to investigate it and find out what's wrong with him, and then you have to transport him, what, an hour and a half to the nearest medical facility. What would you have done otherwise? I think when he was complaining about excruciating pain, they didn't address him to check his leg. They didn't ask him to put his pants down, so they didn't have an observation of how swollen his leg is or anything of that nature, the stiffness of his leg. So they didn't take extra steps they should have taken. Was he given any medication at the prison before he was sent away? He was, but it was geared towards the jaw, because that's what they were— What was he given? Ibuprofen, I believe, and another medication for pain. Doesn't come to me right now, Your Honor. As far as the correctional officers and the defendants there—I mean, the appellees there, there, the overall complaint is that there was approximately four denials—three denials of a motion to compel, about four meeting confers. He was strung along. He wasn't really given the evidence he needed to have when he requested discovery. The meeting confer eventually led to some discovery being given to him nine months later. For example, the video that he could have used to be able to hear what he said when it was fresh in his mind at the time of the interview was not made available to him until the day of the deposition. And without—unannounced, he didn't even—so he didn't—and then it didn't—it wasn't complete. He was told he was going to have another chance to review the video. He never did have another chance to review the video. There were some, I guess, some problems with getting the video to him because he changed the prison location. Nonetheless, he never had a second chance to review the video and use the evidence in that video to prepare for summary judgment. Another example as to—that was General Pelley's question regarding training. There was a declaration by J. Barba that summarized the response, but J. Barba was not a percipient witness. He was not a medical expert. He was a litigation coordinator, but yet he was able to answer questions on behalf of that particular deposition—I mean, interrogatory. He didn't even state his qualifications to answer that question. So that was ignored. When they gave him his—Collier-Ross gave him his medical chart or answered—he wanted specific detail on his injury. He said, well, you have the medical chart. Well, Mr. Wheeler is not a medical doctor. He didn't have an expert at that point to review that medical chart to prepare for the summary judgment. So he didn't give a detailed answer. Most of the complaints are about no detailed answers in this case. With that, I will reserve. Thank you. All right. Thank you. Good morning. May it please the Court, Supervising Deputy Attorney General Lawrence Bragg representing defendants in Appellees Allison, Anchita, Duck, Loftus, Louder, Murrieta, Newbarth, and Ross. Per our agreement with accounts for Dr. Mui, my clients will argue for 10 minutes, and Dr. Mui will argue for 5. The district court's judgment should be affirmed because the correctional officer's reasonably applied force under the circumstances. The judgment in favor of Warden Allison should be affirmed because she didn't personally participate in making staffing decisions and reasonably understood that all positions were filled on the day of the incident, and there were no prior incidents in the area where Mr. Wheeler was assaulted, so she didn't have any subjective knowledge that additional staff were required in that area. And the judgment should be affirmed because the medical defendants appropriately responded to Mr. Wheeler's injuries. After the altercation and the interview of Mr. Wheeler, was he given pain medication? Yes, Your Honor. And to address, I think, a misperception of the facts in this particular case, he was given pain medication. He was given ibuprofen. And what else? That's it. And Mr. Ross, in his declaration — And what strength? Pardon? What strength? I'd have to go check the record, Your Honor. But it was probably a standard nonprescription strength. And Dr. — and Mr. Ross explained in his declaration why it was that stronger medication was not given. And the reason that stronger medication was not given was because Mr. Wheeler had sustained a head injury. And people with head injuries often can have their symptoms masked if they're given strong medications such as morphine or other type of opioid or narcotic medications. So Mr. Ross gave what medication he could before Mr. Wheeler was taken to the outside medical facility. Was there evidence that Mr. Wheeler's head had hit the concrete, the floor? There's — no. I don't think there's any evidence that his head hit the concrete. Well, you were talking about they were concerned about the pain medication given him because he had a head injury. What was the head injury? The head injury stemmed from the original assault by inmate Yepis. Or he was slugged in the face and had his jaw broken. I think he was slugged in the back of the head and on the side of the head and had his jaw broken in two places. And he was struck at least twice. And I think Mr. Ross was reasonably concerned because he had been struck twice in the course of the assault by Yepis that he had sustained a head injury so that stronger medication would not be required. Does the Corcoran facility have X-ray equipment? Yes, it does. And actually, one of the reasons why it took a period of time for Mr. Wheeler to be referred to the outside hospital is because he was administered Pataflex X-rays of his teeth and jaw. And that's what confirmed that he had the jaw fracture in two places. How many of these serious injuries were produced by other inmates and how many by the guards? Well, for Mr. Wheeler, the injuries that were caused by the inmate would be the fracture in two places. And the injuries that would have been resulting from the reasonable use of force by the guards would be the injury to his left leg. And also, he had pepper spray applied, but there doesn't seem to be much contention about that. So in this particular case, turning to the use of force, the ---- So can I have you back up? So counsel, I've mentioned a three-hour delay, but what you're saying is that part of that three-hour delay involved the X-ray that was done at Corcoran? Yes. And Mr. Ross's declaration indicates that not only did he have the X-rays done, but he also consulted with the doctor, Dr. Laib, who actually made the decision to refer Mr. Wheeler for a higher level of care at an outside hospital. And so to address the Justice's point previously, the interview that's referred to took place after Mr. Wheeler got back from the hospital. It did not take place the day of the incident. And, you know, I think that that's pretty clear in Mr. Wheeler's motion to compel, which is at the court record, docket number 98, excerpts of record 290. It happened on the 24th, I believe, of January after he got back. So that the fact that he was being interviewed was not a reason to delay. The reason for the delay was to diagnose his injuries and to consult with a physician as to the best course of treatment. So turning to the use of force, the defendant officers first encountered Mr. Wheeler when he was chasing inmate Yepes through the building, attempting to attack him. And Mr. Wheeler acknowledges this in his own deposition testimony, where he says that he attempted to grab Yepes's collar on one hand and ordered both inmates to comply with orders to get to the ground, but only Mr. Yepes complied. And so at that particular point in time, according to Mr. Wheeler, Mr. Yepes was 9 to 10 feet away from him. He was facing Mr. Yepes. And the officers perceived at that point that Mr. Yepes was susceptible to further attack. And while Mr. Wheeler claims that he didn't hear the initial commands to get to the ground, he also does not dispute that the demands were given. It's undisputed that the officers were unaware of Mr. Wheeler's diagnosis of post-traumatic stress disorder. All they knew is that Mr. Wheeler was not complying with commands to get to the ground and was in a position to harm Mr. Yepes. The officers did not know what Mr. Wheeler was up to, and they shouldn't really have to wait for him to take the first move in reasonably applied force to prevent an attack on Mr. Yepes. They applied force in the form of pepper spray, which was unsuccessful, and in the form of initial baton strikes, which also were unsuccessful, because Mr. Wheeler testified in his deposition that he remained on his feet after those first two steps. And even after remaining on his feet, Mr. Wheeler then took a further step by turning towards the officers. And so at that particular point, he posed a threat not only to inmate Yepes, but also to the officers. And so under those circumstances, the officers reasonably perceived a threat not only to inmate Yepes, but also to themselves. And additional baton strikes were appropriate to prevent further attacks on both. I didn't hear Mr. Valenzuela argue about this issue. Did you? No. You can use your time the way you want. Thank you. But so under these circumstances, the Court should apply deference to the split-second decisions that were made by the officers in the heat of a potentially escalating situation, and applying the Supreme Court factors identified in Hudson v. McMillan and Whitley v. Albers. The officers did perceive a threat first to inmate Yepes and then to themselves. The need for the force was to prevent these attacks. And the need for the force was to get Mr. Wheeler on the ground to not only eliminate the need for further attacks, but also to put him in a position where he could be controlled. Mr. Valenzuela did argue the discovery issue in particular with regard to the videotape. He indicated that the record shows that Mr. Wheeler never got an opportunity to fully review the tape. Well, the video interview is an interview of Mr. Wheeler that took place, again, on January 24th of 2011 after he returned. And it was an interview that gave Mr. Wheeler an opportunity to document what he had experienced in going through it. And so he did have an opportunity to view it at his home if he wished, and there's no indication that he ever asked for the opportunity to do it, to view it again. And again, keeping in mind that this interview really consisted of Mr. Wheeler's recollection of what happened, I would refer the Court to Mr. Wheeler's complaint, where Mr. Wheeler spent 25 or 26 pages describing in single-space detail exactly everything that happened in the course of these events. And so the fact that he didn't get a copy of the video until his deposition did not prejudice his ability to prosecute this case at all, because all Mr. Wheeler had to do would be to just refer to his complaint that he originally had filed, which was much longer and in much greater detail. So with respect to the officers, to wrap up, their force was reasonable under the circumstances to prevent an attack. The injury that was sustained by Mr. Wheeler was a nondisplaced fracture, and it didn't require any specific treatment at all. And I think that that's a factor that mitigates in favor of a finding that the force was reasonable under the circumstances. With respect to the medical personnel, starting with Mr. Ross, Mr. Ross did document in his medical records that Mr. Wheeler had a leg bruise, and it was with the expectation that he would require or that he would obtain further treatment as needed. Mr. Ross was the second. Sotomayor, I don't want to interrupt. I know you did want to save five minutes for Mr. Pack. I do not want to impose on Dr. Mouey's time. So I would urge for the reasons argued today and in the brief that the judgment be affirmed. Thank you. Good morning, Your Honors. My name is Pat Carrick. I am attorney for the defendant and appellee, Dr. Byron Mouey. I need to emphasize right off the bat there are only two issues concerning Dr. Mouey. They're expressed in the opening brief, the only brief filed by the appellant, on the last two pages, and they consist of two things. One, whether the defendant Ross should have been required to provide a further response to a particular interrogatory that was put to him, and two, whether there's something wrong with the first question of the special verdict form that was submitted to the jury and ultimately was decisive. With respect to that form and that question, we submit that whatever the standard of review may turn out to be, whether there is, as we think, an unreviewable waiver under Guy v. City of San Diego, or whether there has now been a change in the wind since 2018, I guess, because Claiborne v. Blouser cites a 2018 case. And now, if it's not, there's a distinction between forfeiture and waiver, and if it's determined to be a forfeiture, then plain error review applies. Either way, there's not going to be a reversal with respect to Dr. Mouey unless there was an error in the question, unless the question was erroneous. In the case of plain error, it has to be much more than just erroneous. We don't think there's any error in the question at all. Mr. Wheeler presented at the hospital with multiple injuries. The jaw was the big one, and that's why he was there. And we also know from testimony I'll get to in just a second that he had a bruise, and he had various complaints of pain here, there, including around his knee. The purpose of the reference to X-ray findings in the first question is not to make X-ray findings the medical condition. It is to establish that the medical condition we're talking about, as far as the jury is concerned, is the fracture, the fracture to his left distal femur, the nondisplaced fracture to his left distal femur. That's the condition. When we start talking about his pain, we're talking about whether it was a serious medical condition. And that's not the purpose of — well, that's the purpose of question number one, but it's a different part of that question. The first thing is to identify what's the condition that we want to determine was serious or not. And it's the condition that they found in the X-ray findings ordered by the emergency room physician. There's nothing confusing about that. It would have been confusing if the jury had been allowed to consider the fractured jaw, the bruise, his assorted aches and pains. If they'd been able to take the totality of that and say that's the serious medical condition, to which Dr. Mui may or may not have been deliberately indifferent, that would have been a problem, but it would have been a problem for us that we would have needed to fix. This merely asked them the correct question. With respect to the interrogatory — Kennedy. Mr. Wheeler's counsel suggested an alternative inquiry or instruction? No. As a matter of fact, on the record, they were asked outside the presence of the jury immediately after the in-chambers conference about the jury instructions and the special verdict form, they were asked if they had any objections to put on the record with respect to either of those things. And their answer is right here in the supplemental excerpts of record, no, Your Honor, we don't. Now, the question becomes under this — this late development whether that's a forfeiture, because they didn't say, yes, Your Honor, we approve of it, or whether that's a waiver. We think it's still a waiver, but reasonable minds may be able to differ on this. That's why we brought this case to the Court's attention, was to play fair. But we think that ultimately it doesn't matter, because either way, that question was appropriate. And if that question is appropriate, you don't have plain error, you don't have any kind of error. You don't have abusive discretion. You don't have a problem. We'd like to point out that Mr. Wheeler contended, and still contends in the opening brief, that Mr. Ross, who was the physician's assistant at the prison where he was in the prison hospital, that Mr. Ross had admissible evidence to provide with respect to the deliberate indifference of Dr. Mui. That was the reason why he wanted a further response. And Dr. — Dr. Mui called Mr. Ross as a witness at trial. And some of his testimony is excerpted in our supplemental excerpts of record at pages 38 to 41. He said on cross-examination by Dr. — Mr. Wheeler's attorneys that he remembered two complaints, the jaw and a bruise on the left thigh that was nowhere near the knee. And remember, a nondisplaced fracture of a left distal femur occurs near the knee. That was also in evidence, and it's in the record. Those were the two complaints that he remembered. Well, the interesting thing about that is that's not very damaging to Dr. Mui. The other thing that he said on direct was that, A, the only reason that Mr. Wheeler was referred to the hospital was because of the jaw, and, B, that if he had had a fracture and they'd known he had a fractured leg, they could have treated that at the prison hospital. It did not have to be treated at an outside hospital. He did not have to be referred to receive treatment for that if they'd been aware of it. All right. You're over time. Thank you, Counsel. Your Honor, with respect to the fight or the excessive force, you know, the counselman has briefly indicated that we're quibbling about facts. Well, those facts are important. And the video is important because that video would have helped him, the video interview would have helped him identify what exactly took place because it was fresh at the time or day or two after it happened. The complaint was drafted many months after. It's based on memory. I can't remember what I did yesterday, let alone months ago. So the video was important. It could have established for him where he was, what position he was in. For example, he gave chase. There's no question about that. Well, Counsel said he never asked for another opportunity. Is that true? No, that's not true. He asked for it three times, according to the record. The inmate that hit him was on the ground, prone, 9 to 10 feet ahead of him. But yet, he was standing frozen, according to him, because of PTSD. This is not an ordinary prison. This is a treatment prison. It's here for people that need treatment. So it's hard to imagine that the first thing you do is beat somebody down when they're standing and they're not actually touching the other party. So that's why the video is important for those facts. Another thing I want to mention, as far as Appellee Miu, counsel indicates in his brief that the clincher is the jury convicted, I mean, found the verdict in favor of his client. But that clincher only took place because the special verdict was wrong. Peralta states that jury instructions must be supported by the evidence, fairly and adequately cover the issues presented, correctly state the law, and not be misleading. That's at 1182. I don't know that the law was correctly covered if you didn't talk about the pain. The deliberate indifference statute includes wanton pain in addition to serious medical need. So how could you exclude the pain? You're not seeing the whole picture. So in my opinion, it was a little misleading, if not at all — if not, it was incorrect law. Thank you, Your Honor. Thank you very much to all counsel for your arguments in this case. And thank you, Mr. Valenzuela, for accepting the appointment in this case. The matter is submitted.
judges: Siler, Hawkins, Nguyen